IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|                                          |     |                         |
|------------------------------------------|-----|-------------------------|
| MARIA HERRERA,                           | )   |                         |
|                                          | )   |                         |
|                                          | )   |                         |
| Plaintiff,                               | )   |                         |
| v.                                       | )   | No.  11 C 5762          |
|                                          | )   |                         |
| ILLINOIS BELL TELEPHONE COMPANY,         | )   | Judge Virginia M. Kendall |
|                                          | )   |                         |
| Defendant.                               | )   |                         |
|                                          | )   |                         |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Maria Herrera ("Herrera") filed suit against Defendant Illinois Bell Telephone
Company ("Illinois Bell"), alleging disability discrimination in violation of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*., and retaliation in violation of the Family
Medical Leave Act ("FMLA"), 29 U.S.C. § 2611*, et seq*.  Herrera, a former employee of Illinois Bell,
was terminated in March of 2010 from her position as a customer care representative.  Herrera
alleges Illinois Bell terminated her employment because of her disability (depression and anxiety)
(Count I), and retaliated against her for taking a leave of absence from her employment under the
FMLA (Count II).  Illinois Bell moves for summary judgment on both counts of Herrera's
Complaint.  For the reasons discussed below, Illinois Bell's Motion for Summary Judgment is
granted.

## STATEMENT OF MATERIAL UNDISPUTED FACTS[1]

Illinois Bell provides telecommunications and entertainment services to residential and business customers in Illinois. (Def. 56.1 St. ¶ 2.) The company maintains a Customer Call Center ("CCC") in Chicago, Illinois, that is staffed by Customer Service Representatives ("CSRs") who assist customers calling with issues related to orders, billing, and service. (*Id.* ¶ 5.) In order to accommodate the service needs of Illinois Bell's diverse customer base, the CCC includes teams of bilingual CSRs who compose a Bilingual Call Center within the CCC. (*Id.* ¶ 6.)

### I.     Herrera's Employment with Illinois Bell

During the relevant employment period, Herrera, fluent in Spanish, was a bilingual CSR at the CCC. (*Id.* ¶¶ 7–8.) As a bilingual CSR, Herrera fielded calls primarily from Spanish-speaking customers, but also assisted English-speaking customers when high call volumes at other centers resulted in overflow calls that were rerouted to the Bilingual Call Center (*Id.*) At the time of her hire in May of 2000, Herrera received six weeks of basic training, which included training with Illinois Bell's computer systems, call flow process, and instruction on how to speak with customers. (Pl. 56.1 ¶¶ 3–4.) CSRs have two primary job responsibilities – customer service and sales. (*Id.* ¶ 9.) This meant that on each call, Herrera's responsibility was to first respond to the customer's questions and solve any problems the customer may be experiencing, and then transition the call to a sales opportunity and offer the customer additional products, services, or upgrades. (*Id.* ¶ 10; Pl. 56.1 St. ¶ 3.) During her employment, Herrera was a member of the International Brotherhood of Electrical

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Illinois Bell's Statement of Undisputed Facts (Dkt. No. 22) have been abbreviated to "Def. 56.1 St. ¶__"; citations to Maria Herrera's Statement of Additional Material Facts (Dkt. No. 30) have been abbreviated to "Pl. 56.1 St. ¶ __"; citations to Maria Herrera's Response to Illinois Bell's Statement of Undisputed Facts have been abbreviated to "Pl. 56.1 Resp. ¶__."; and citations to Illinois Bell's Response to Maria Herrera's Statement of Additional Material Facts have been abbreviated to "Def. 56.1 Resp. ¶ __."

Workers Local 21 ("IBEW") and the terms and conditions of her employment were governed by a collective bargaining agreement between IBEW and Illinois Bell. (Def. 56.1. St. ¶ 4.)

## II. Management of the Customer Care Center

### A. Management Structure

The management structure of the CCC includes three levels of managers. (*Id.* ¶ 12.) The first-line managers are Sales Coaches, who are primarily responsible for the direct supervision of a team of CSRs. (*Id.* ¶ 13.) Sales Coaches provide CSRs with training, ongoing coaching, tools, and job aids to assist them in successfully performing their work. (*Id.*) Sales Coaches also document their coaching instruction and discipline of CSRs in "coaching logs." (*Id.*) The second-line of managers are Center Sales Managers (*Id.* ¶ 14.) Center Sales Managers supervise Sales Coaches and ensure the teams under each Sales Coach's supervision are meeting required minimum sales and customer service goals. (*Id.*) The third-line manager is the General Manager, who supervises the Center Sales Managers and is ultimately accountable for the success or failure of the CCC. (*Id.* ¶ 15.)

In or about January of 2009, Gino Pacheco ("Pacheco") became Herrera's Sales Coach. (*Id.* ¶ 16.) Prior to that, Herrera reported to Sales Coach, Rupert Medina ("Medina"). (*Id.*) Sales Coaches Medina and Pacheco reported to Leticia Hernandez ("Hernandez"), the Center Sales Manager who managed the teams of bilingual CSRs in the CCC. (*Id.* ¶ 17.) Depending on the time period, there were approximately 150 to 225 CSRs under Hernandez's supervision composing 8 to 12 teams. (*Id.*) Hernandez reported to the CCC's General Manager, Arlene Johnson from 2007-2009, David Pojtinger during most of 2009, Carolyn Mundy for six months from November 2009 to April 2010, and Gisela Rodriguez from April 2010 to September 2010. (*Id.* ¶ 18.)

## B.    The CCC's Performance Management System

During the relevant employment period, CCC utilized the Performance Achievement Review ("PAR") system to manage the performance of its CSRs. (*Id.* ¶ 19.)  PAR is an objective scoring system that sets monthly objectives CSRs are required to meet in three different categories: productivity, customer effectiveness, and "grow revenue." (*Id.* ¶ 20.)  These objectives are set monthly by a work group outside of the CCC, and CSRrs are notified of the objectives at the beginning of each month. (*Id.* ¶ 24.)  The "productivity" score measures CSRs' efficiency in call handling (i.e., the average amount of time spent handling calls that month). (*Id.* ¶ 22.)  The "consumer effectiveness" score is calculated based upon the CSR's Sales Coach's evaluation of calls they observe the CSR handle. (*Id.* ¶ 23.)  The "grow revenue" score is based on whether CSRs meet minimum sales targets for products or services offered by Illinois Bell, including telephone, internet, and television service. (*Id.* ¶ 21.)  Illinois Bell calculates a monthly overall PAR scores for each CSR using weighted averages of the CSR's productivity, customer effectiveness, and "grow revenue" scores. (*Id.* ¶ 25.)  Throughout her employment, Herrera received copies of Illinois Bell's Performance Management Guidelines, which detailed what was expected of managers when evaluating PAR scores. (Pl. 56.1 St. ¶ 5; Def. 56.1 Resp. ¶ 5.)

During the relevant employment period, CSRs were required to maintain a minimum monthly overall PAR score of 85, which was considered "meeting some expectations." (Def. 56.1 St. ¶ 26.)  In 2009, the method of calculating the PAR score was changed from a three-month rolling score, which averaged a CSR's PAR scores for the previous three months, to a month-to-date score, which evaluated performance based on a single month only. (*Id.* ¶¶ 27–28.)  Also at this time, Illinois Bell

added a "CRIFT" score, which was derived from surveys of customers whose calls the CSRs handled. (*Id.* ¶ 29.) The monthly required minimum score of 85 remained unchanged. (*Id.* ¶ 30.)

The CCC begins finalizing PAR scores at the close of each month. (*Id.* ¶ 37.) However, because compiling PAR score data is time consuming, the actual release of PAR scores for any given month is delayed until 4 to 6 weeks after the end of that month. (*Id*; Pl. 56.1 St. ¶ 5.) For example, January PAR scores are generally not available until the end of February or beginning of March. (Def. 56.1 St. ¶ 37.) After the release of PAR scores, Hernandez identifies which CSRs had unacceptable scores, and schedules meetings with their Sales Coaches to review the CSR's performance history and determine whether discipline is necessary (*Id.* ¶ 38.)

### C.    The CCC's Progressive Discipline Policy

During the relevant employment period, the CCC used a three-step progressive discipline policy for CSRs who failed to meet PAR standards. (*Id.* ¶ 33.) This policy included: (1) a written warning; (2) a final written warning with one-day unpaid suspension; and (3) suspension pending termination. (*Id.*) A CSR receiving a written warning for an unsatisfactory PAR score is placed on a performance improvement plan ("PIP"), which remains in effect until the CSR achieves satisfactory scores for 90 days. (*Id.* ¶¶ 34–35.) If the CSR continues to attain unsatisfactory PAR scores after receiving a written warning, the CCC pursues the second and third steps of its discipline policy. (*Id.* ¶ 36.)

In certain circumstances, Hernandez may decide that an exception to the monthly minimum score requirement is warranted. (*Id.* ¶ 39.) In such cases, Hernandez may either (1) grant an "SR-30" which functioned to excuse an unsatisfactory PAR score for a given month and prevent progression to the next step of coercive action, or (2) allow the CSR to repeat the last step of the progressive

discipline process rather than proceeding to the next step. (*Id.*) As a Center Sales Manager, Hernandez has the sole authority to issue SR-30s and not progress an underperforming CSR to the next step of the disciplinary process. (Pl. 56.1 St. ¶ 26.) Among the factors Hernandez considers when determining whether to grant an exception are trends in PAR scores, the CSR's performance history, training, coaching, and development opportunities provided to the CSR. (Def. 56.1 St. ¶ 39; Pl. 56.1. Resp. ¶ 40.) After Hernandez determines, with input from the CSR's Sales Coach, that discipline is appropriate for a CSR's unsatisfactory PAR score, the Sales Coach meets with the CSR to review the monthly PAR score and administer discipline. (Def. 56.1. St. ¶ 41.) Each CSR's monthly PAR scores, as well as any related discipline and SR-30s, are documented in coaching logs. (*Id.* ¶ 43.)

## II. Herrera's Performance

Herrera failed to achieve the minimum PAR scores for nine out of the twelve months preceding her termination, thereby resulting in progressive discipline and ultimately, termination of her employment with Illinois Bell. (*Id.* ¶ 44.) The following table summarizes Herrera's monthly PAR scores and any disciplinary action or exceptions made for the fifteen-month period ending January 2009:

| Month | PAR Score | Discipline/Exception |
|---|---|---|
| Nov. 2008 | 73.35 | SR-30 |
| Dec. 2008 | 69.43 | First Written Warning; PIP |
| Jan. 2009 | 66.02 | No Discipline |
| Feb. 2009 | 73.2 | SR-30 |
| Mar. 2009 | 73.57 | Final Written Warning; One-Day Suspension |
| Apr. 2009 | 85.91 | No Discipline |
| May 2009* | 83.05 | Repeat Final Warning; One-Day Suspension |
| June 2009 | 87.44 | No Discipline |
| July 2009 | 77.82 | Repeat Final Written Warning |
| Aug. 2009 | 101.34 | No Discipline |
| Sept. 2009 | 79.96 | Repeat Final Written Warning; One-Day Suspension |
| Oct. 2009 | 66.19 | Suspension Pending Termination |
| Nov. 2009 | 85.81 | No Discipline |
| Dec. 2009 | 99.19 | No Discipline |
| Jan. 2010 | 92.5 | No Discipline |

(*Id*).

According to Herrera, several factors hindered her ability to meet her sales goals after Illinois Bell introduced its "U-Verse" product line, including: (1) a decline in the economy; (2) U-Verse being a more expensive product; (3) U-Verse could not be easily bundled with other products; (4) many of the accounts Herrera dealt with were past due and she could not sell to those accounts; (5) customers having had prior bad experiences with U-Verse where it was not installed, took too long to be installed, or did not work correctly; (6) there was a specific group employed by Illinois Bell, the "NT U-Verse group", that was in charge of U-Verse sales to new customers, leaving Herrera with

calls from customers who previously had U-Verse service that was cancelled due to non-payment or suspended,[2] and (7) customers could not pass a credit check, had fraud alerts on their accounts, or had accounts that were pending a credit check. (Pl. 56.1 St. ¶ 11–12; Herrera Dep., p. 50.) Herrera concedes these factors impacted other CSRs who faced similar obstacles with respect to Illinois Bell's U-Verse products so the difficulties did not apply solely to her. (Def. Resp. 56.1 ¶ 11; Herrera Dep., p. 56.)

Pacheco met with Herrera to review her PAR scores and to administer any related discipline approximately six weeks after the close of any given month. (Def. 56.1 St. ¶ 42.) After receiving a written warning for her unsatisfactory PAR score in December 2008, Pacheco placed Herrera on a PIP. (*Id.* ¶ 45.) Pacheco reviewed Herrera's May 2009 PAR score on July 10, 2009, her June 2009 PAR score on August 4, 2009, and her July 2009 PAR score on September 17, 2009. (*Id.*) Herrera was provided with a development plan that included peer to peer coaching, and Pacheco told Herrera to take various online courses, which Herrera completed. (Pl. 56.1 St. ¶ 7; Def. 56.1 Resp. ¶ 7.) Herrera also requested additional training and peer coaching in order to learn new ways of speaking with customers and new verbiage to incorporate into her sales pitch. (Pl. 56.1 St. ¶ 14.) In an effort to increase her sales, Herrera changed her tone during calls, extended her conversations with

---

[2]Herrera also contends the NT U-Verse group had the same sales goals as her fellow CSRs despite having better opportunities to sell U-Verse products. This assertion is not based on Herrera's personal knowledge. Rather, it is based on statements made to Herrera by her IBEW union stewards, Debbie Maples, Rick Sada, and Rick Moreno. Insofar as these statements are being offered to prove the truth of the matter asserted therein – that the NT U-Verse group did in fact have the same sales goals as CSRs – they are inadmissible hearsay and not properly before the Court on summary judgment. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). *See also Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) (inadmissible hearsay not enough to preclude summary judgment); *Esenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (hearsay is inadmissible in summary judgment proceedings to the same extent it is inadmissible at trial). Herrera's assertions in paragraphs 9, 15, 38, and 39 of her Statement of Additional Material Facts are also not properly before the Court for the same reason.

customers, and attempted painting a picture to customers of how a particular product would be useful to them in their daily lives, and. (Pl. 56.1 St. ¶ 17.)

Herrera also informed Pacheco that she was having personal problems, and that she was taking medication that made her drowsy, nauseous, and caused her to hyperventilate and use the washroom every now and then. (Pl. 56.1 St. ¶ 19.) Pacheco told Herrera that everyone has problems and takes medication for different things, and that "if she had to screw and fuck the customer to make sales, then that is what it takes," and that is what he expected her to do. (Pl. 56.1 St. ¶ 21.)[3] Pacheco also made embarrassing remarks about Herrera's condition in front of the other employees, such as "Maria you are turning red," and "Maria don't come into work with the long face." (*Id.* ¶ 22.)[4] Victoria Espinoza ("Espinoza"), another one of Herrera's Sales Coaches, would see Herrera turning red or getting frustrated and ask if Herrera needed to go cry in the bathroom or if she needed someone to come and hold her. (*Id.* ¶ 23.)

---

[3]Illinois Bell responds to this assertion by stating that Pacheco denies making such comments, but does not point to any evidence in the record to support its denial. Such unsubstantiated denials are insufficient, and Herrera's assertions are therefore properly before the Court on summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001) (adequate rebuttal requires a citation to specific support in the record; unsubstantiated denials are inadequate).

[4]Illinois Bell has responded to several assertions in Herrera's Statement of Additional Material Facts by simply stating "Illinois Bell admits that Herrera testified to the allegations contained in paragraph ..." without pointing to specific evidence in the record that demonstrates the fact is in dispute or providing an evidentiary basis for why the Court should not consider a particular fact on summary judgment. The Court finds that these passive denials (or, depending upon how they are read, conditional admissions), without basis or support to the contrary, do not constitute adequate denials. Therefore, such assertions of fact, where material and otherwise admissible, will be deemed admitted by Illinois Bell to the extent they are supported by Herrera's citation to the record. *See* N.D. Ill. R. 56.1(b)(3)(C) ("All material facts set forth in statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party."); *Albiero*, 246 F.3d at 933 (adequate rebuttal requires a citation to specific support in the record; unsubstantiated denials are inadequate). Illinois Bell also argues that "many of Herrera's allegations are not relevant to the issues raised on summary judgment." (Def. 56.1 Resp., p. 1.) This does not excuse Illinois Bell from indicating whether it agrees with or denies the allegation. *See Ammons v. Aramark Uniform Svcs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004) (assertion that allegations in opposing party's 56.1 statement were "irrelevant" does not excuse the party from "at least indicating that it agrees with or denies the allegation").

## IV. Herrera's Disciplinary Process and Termination

In October of 2009, Herrera received a PAR score of 66.19, her ninth unsatisfactory score in twelve months. (Def. 56.1 St. ¶ 48; Pl. 56.1 Resp. ¶ 48.) As the Table above indicates, Illinois Bell gave Herrera two SR-30s and allowed her to repeat the second step of the progressive discipline process (final written warning) three times before progressing her to suspension pending termination. (Def. 56.1 St. ¶ 44; Pl. 56.1 Resp. ¶ 47.) In November of 2009, Herrera began experiencing several personal health and family issues that significantly increased her stress and anxiety levels. (Pl. 56.1 St. ¶ 29.) These issues caused Herrera to seek leave from work from December 3, 2009 through March 7, 2010. (Def. 56.1 St. ¶ 51; Pl. 56.1 St. ¶¶ 29–30.) Herrera had previously used Family and Medical Leave Act ("FMLA") leave during her employment with Illinois Bell. (Def. 56.1 St. ¶ 51.) Herrera was aware that her job was in jeopardy due to poor performance when she went on leave in December of 2009 and reported to her healthcare provider that she feared she might lose her job at Illinois Bell due to her poor performance. (Def. 56.1 St. ¶ 55.) Due to the time required to finalize sales data and compute PAR scores, Herrera was on FMLA leave by the time her October 2009 PAR score became available. (Def. 56.1 St. ¶¶ 50, 52.) Although Hernandez had access to Herrera's coaching log, she became aware that Herrera was on FMLA leave only after Pacheco informed her that he was unable to meet with Herrera to review her October 2009 score and administer a suspension pending termination. (*Id.* ¶ 54; Def. 56.1 Resp. ¶ 24.)

Herrera's PAR scores for November 2009, December 2009, and January 2010 were also generated while she was on FMLA leave. (Def. 56.1 Resp. ¶ 56.) However, Hernandez had already made her decision to suspend Herrera pending termination after receiving her unsatisfactory October 2009 PAR score. (*Id.* ¶ 57.) Hernandez found Herrera's November score of 85.81 inconsequential

in light of her inability to sustain satisfactory PAR scores over the previous 12 months. (*Id.*) Hernandez also considered Herrera's December PAR score of 99.19 inconsequential because Herrera went on FMLA leave at the beginning of the month, meaning her PAR score for December was based on only 52 calls – the equivalent of one and a half days of work. (*Id.* ¶ 58.) Because Herrera did not work in January 2010, her PAR score of 92.5 for that month was calculated using the three-month rolling method, and did not reflect any actual work performed.[5] (*Id.* ¶ 59.)

When Herrera returned from leave on March 8, 2010, she met with Pacheco and Hernandez to review her October 2009 PAR score (*Id.* ¶ 60.) Pacheco and Hernandez informed Herrera she was being suspended pending termination due to her lack of consistent satisfactory job performance. (*Id.*) After her suspension, Herrera began seeking alternative employment and received an offer from U.S. Cellular on March 24, 2010. (*Id.* ¶ 61.)

On March 26, 2010, in compliance with the grievance procedure in the collective bargaining agreement, Illinois Bell and IBEW representatives held a Review Board meeting to present IBEW's arguments against termination of Herrera's employment. (*Id.* ¶ 62.) Hernandez and Toni McGhee, Illinois Bell's Labor Relations Manager, attended the Review Board meeting on behalf of Illinois Bell. (*Id.* ¶ 63.) Several of the factors considered when deciding whether to terminate an employee after the Union Management Review Board meeting are whether: (1) the company properly trained the employee; (2) the company followed-up with coaching and development of the employee as needed; (3) the company followed-up with appropriate steps as part of the disciplinary process; and

---

[5]The parties have not provided calculations explaining how Herrera achieved a composite score of 92.5 for January 2009. It appears that the three-month rolling method used to compute this score does not weigh each of the preceding three months equally, as the average of Herrera's October, November, and December PAR scores equals 83.73 [(99.19 + 85.81 + 66.19) / 3].

(4) management, after reviewing the records, did what was necessary to allow the opportunity for the CSR to be successful. (Pl. 56.1 St ¶ 34.)  At the time of the Review Board hearing, Hernandez was in possession of Herrera's November and December 2009 PAR scores.  (*Id.* ¶ 35.)

At the Review Board meeting, IBEW highlighted Herrera's length of service and explained her position that it was difficult to sell Illinois Bell's U-Verse product due to economic decline and installation problems which led to customer cancellation. (*Id.* ¶ 64.)  Herrera disclosed to Hernandez for the first time that she had been taking medication that sometimes caused her illness such as vomiting, nausea, stomach aches, insomnia, and confusion. (*Id.* ¶ 65.)  Herrera also informed Hernandez that the medications had been adjusted a week or two prior to her return to work on March 8, 2010, and that she was more stable than she had been prior to taking a leave of absence. (*Id*; Def. 56.1 Resp. ¶ 25.)  Neither Herrera nor the IBEW mentioned at the Review Board meeting that they felt Herrera's use of FMLA leave, short-term disability leave, or her anxiety and/or depression were factors in Illinois Bell's decision to terminate her employment.  (*Id.* ¶ 68; Pl. 56.1 Resp. ¶ 68.)

Hernandez upheld Herrera's termination based on Herrera's failure to demonstrate sustained satisfactory job performance despite Illinois Bell's efforts to provide her with coaching and development. (Def. 56.1 St. ¶ 70.)  While Herrera admits that these were the stated reasons for her termination, she maintains they were not the only reasons. (Pl. 56.1 Resp. ¶ 70.)  The decision to terminate Herrera was not made on the same day as her Review Board hearing. (Pl. 56.1 St. ¶ 36.) Hernandez took time to review all the information given at the meeting and made her decision a few days later. (*Id.*)  Hernandez informed the union representative of her decision when it was made. (*Id.*) At the time the decision was finalized, Hernandez did not know why Herrera was on medication or

used FMLA leave. (Def. 56.1 St. ¶ 71.)  On April 9, 2010, Hernandez communicated to IBEW her decision to terminate Herrera's employment effective March 30, 2010. (*Id.* ¶ 72.)

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14 (1986).  However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record and not adequately rebutted by the opposing party, the Court will accept that statement as true for the purposes of summary judgment.  An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").  As the party opposing the motion for summary judgment, Herrera "gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d

13

312, 314 (7th Cir. 2011). However, she cannot rely on mere conclusions and allegations to create factual issues. *Bladerston v. Fairbanks Morse Engine Div. Of Coltec Ind.*, 328 F.3d 309, 320 (7th Cir. 2003). Nor can speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)).

## **DISCUSSION**

Count I of Herrera's Complaint alleges Illinois Bell terminated Herrera because of her disability and in order to avoid having to accommodate her disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*[6] In Count II of her Complaint, Herrera alleges Illinois Bell discharged her in retaliation for her use of FMLA leave in violation of the Family Medical Leave Act, 29 U.S.C. § 2611 *et seq.*

The ADA prohibits discrimination against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Discrimination," as proscribed by the ADA, generally encompasses two distinct claims: disparate treatment and failure to provide a reasonable accommodation. *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021–22 (7th Cir. 1997) (internal quotations and citations omitted); *see* 42 U.S.C. §§ 12112(a), 12112(b)(5)(A). The FMLA allows eligible employees to take unpaid leave to tend to a serious health condition, and prohibits employers from terminating employees who have taken FMLA leave. 29 U.S.C. §§ 2612(a)(1)(D), 2615(a)(2); *see also Long v. Teachers' Retirement Sys. of the State of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009).

---

[6]Herrera does not assert a failure to accommodate claim.

Because "the motivation and implementation behind the ADA was similar to that of the Civil Rights Act of 1964, courts often look to the Civil Rights Act for ADA guidance." *Dickerson v. Bd. of Trustees of Comm. College Dist. No. 522*, 657 F.3d 595, 600 (7th Cir. 2011) (collecting cases). As with Title VII cases, a plaintiff bringing a disability discrimination claim under the ADA or an unlawful retaliation claim under the FMLA must establish a prima facie case under either the direct or indirect methods of proof in order to avert summary judgment. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 548 (7th Cir. 2008) (ADA discrimination); *Long*, 585 F.3d at 349 (FMLA retaliation); *see also Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) ("We evaluate a claim of FMLA retaliation the same way that we would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII.") (citations omitted).

## I.       Direct Method of Proof

To make out a *prima facie* case of disability discrimination under the direct method of proof, Herrera must show that: (1) she has a disability within the meaning of the ADA; (2) she is qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) she was subject to an adverse employment action due to her disability. *See* 42 U.S.C. § 12112(a); *Winsley v. Cook County*, 563 F.3d 598, 603 (7th Cir. 2009); *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005).  Similarly, in order to establish a *prima facie* case of unlawful retaliation under the direct method, Herrera must prove: (1) she was engaged in protected activity; (2) Illinois Bell took adverse employment action against her; and (3) there is a causal connection between Herrera's protected activity and Illinois Bell's adverse employment action. *See Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 824 (7th Cir. 2011) (citing *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008)); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 633 (7th Cir. 2009)

(citing *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008)). Illinois Bell concedes, for the purposes of summary judgment, that Herrera was disabled within the meaning of the ADA, and it is undisputed that her termination was a materially adverse employment action. Furthermore, Illinois Bell does not dispute that Herrera was qualified to perform the essential functions of her job, with or without a reasonable accommodation.[7] Therefore, the only element at issue with respect to both of Herrera's claims is the causal link; that is, whether Herrera was subject to adverse employment action due to her disability or use of FMLA leave.

The analysis of the causal link element under the direct method of proof is the same for Herrera's ADA discrimination and FMLA retaliation claims. *See Buie*, 366 F.3d at 503. A plaintiff may establish unlawful discrimination under the direct method by presenting direct or circumstantial evidence that creates a "convincing mosaic of discrimination." *See Winsley*, 563 F.3d at 603 (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). "Direct is evidence is evidence which, if believed by the trier of fact, will prove the fact in question without reliance upon inference or presumption." *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720–21 (7th Cir. 2005) (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998)). Direct evidence typically comes in the form of an admission by the decision-maker that the decision was based on a discriminatory or retaliatory intent. *See Caskey*, 535 F.3d at 593; *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) ("Direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.") (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)). Circumstantial evidence – evidence that "allows a jury to infer

---

[7]This threshold inquiry is designed to ascertain whether a plaintiff is covered by the ADA at all, and is separate from the inquiry under the indirect method of whether a plaintiff was meeting the employer's legitimate employment expectations. *See Timmons v. General Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006).

intentional discrimination by the decision-maker" through a "chain of inferences" *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007); *Buie*, 366 F.3d at 503 (quoting *Rogers*, 320 F.3d at 753) – typically comes in three forms: "(1) suspicious timing, ambiguous oral or written statements or behavior toward or commends directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical that similarly situated employees outside the protected class received systematically better treatment; [or] (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Good v Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (quoting *Darchak v. City of Chi. Bd. of Ed.*, 580 F.3d 622, 631 (7th Cir. 2009)); *see also Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). While circumstantial evidence, by definition, allows the trier of fact to draw inferences, that evidence must nevertheless point "directly to a discriminatory reason for the employer's action." *Good*, 673 F.3d at 675 (quoting *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003)).

In this case, Herrera's disability discrimination and FMLA retaliation claims both fail under the direct method of proof. Herrera points to no statement by Hernandez, the decisionmaker in this case, suggesting Herrera's anxiety, depression, or use of FMLA leave motivated the decision to terminate Herrera's employment. With respect to circumstantial evidence, Herrera relies almost entirely on the timing of her suspension pending termination, alleging the fact she was suspended the same day she returned from FMLA leave is so suspicious, it "in and of itself is circumstantial evidence to give rise to an inference of discrimination and retaliation." (Pl. Resp. Brief, p. 4.) Neither the facts of this case nor the law in this Circuit support Herrera's position.

Factually, the timing of Herrera's suspension pending termination is not suspicious. After

receiving eight unsatisfactory scores in an eleven-month period, Herrera was already on the brink of termination for prolonged poor performance before her October 2009 PAR scores were released. "While a sudden decline in performance evaluations *after* an employee engages in a protected activity may provide circumstantial evidence of discriminatory intent, a decline in performance *before* the employee engages in protected activity does not allow for an inference of retaliation." *Long*, 585 F.3d at 354 (7th Cir. 2009) (emphasis added) (rejecting plaintiff's allegations that her termination, which occurred after she requested FMLA leave, was retaliatory based on a documented decline in her performance three month prior to her request for FMLA leave). In this case, Herrera's PAR scores began to decline long before she requested FMLA leave in December 2009.

Herrera's suspicious timing argument is further debased by her concession that PAR scores are not computed and released until four to six weeks after the end of the month. Due to this delay, Herrera's October 2009 PAR score – her ninth unsatisfactory score in a twelve-month period – was not available to Hernandez until sometime in December.[8] Herrera does not dispute that Hernandez made the decision to suspend her pending termination upon receiving this score. In light of Herrera's consistently poor performance, and given timing of the release of Herrera's October 2009 PAR scores, the Court finds nothing remarkable, suspicious, or otherwise unusual about Hernandez's decision to commence termination proceedings against Herrera in December of 2009. By that time, however, Hernandez and Pacheco were unable to discuss with Herrera her progression to the third

---

[8]Herrera's assertion that Illinois Bell computed interim PAR scores for October 2009 before Herrera left for disability leave is not properly before the Court. Herrera cites to no evidence in the record supporting the assertion, nor has she demonstrated Hernandez had access to "interim numbers." Herrera argues "[Illinois Bell] has failed to produce any evidence besides the unsubstantiated statements of Hernandez, that the Plaintiff's PAR scores were not calculated prior to her leave." Putting to one side the fact that Herrera admits PAR Scores are not generated until 4-6 weeks after the end of the month, this contention reflects a misapplication of the *McDonnell Douglass* framework. The burden of proof during the first stage of the *McDonnell Douglass* analysis rests on the Plaintiff, not Illinois Bell.

step of the disciplinary process because Herrera had already taken FMLA leave. Although Illinois Bell could conceivably have contacted Herrera at home to inform her that she was being suspended, the Court finds nothing unusual or suspicious about Hernandez's decision to wait until Herrera returned from her disability leave to inform her of Illinois Bell's decision to place her on suspension pending termination.

Indeed, Herrera has not offered any evidence that Hernandez was even aware of Herrera's medical condition or FMLA leave when she made the decision December 2009 to place Herrera on suspension pending termination. The testimony in the record indicates Hernandez did not learn Herrera went on FMLA leave until Pacheco, Herrera's coach, brought it to her attention when Hernandez requested to meet with Herrera to discuss her October 2009 PAR score. With respect to Herrera's medical condition, it was not until the Review Board meeting in March of 2010 that Herrera indicated to Hernandez that she was taking medication. And, even at that point, Herrera informed Hernandez of her use of medication generally, not of a specific medical condition. The undisputed facts make clear that at the time Hernandez made her decision to suspend Herrera pending termination, she was not aware of Herrera's depression and anxiety nor her use of FMLA leave, and that when she made the final decision to terminate Herrera in March, she was only aware generally that Herrera used medication and took FMLA leave for *some* reason.

The fact that Hernandez had access to Herrera's coaching log, which detailed her use of FMLA leave, does not change this conclusion. As a Center Sales Manager, Hernandez was responsible for overseeing approximately 150 to 225 bilingual CSRs comprising 8 to 12 teams. Hernandez is not the immediate supervisor to these CSRs. Rather, the CSR teams are managed by coaches who are under Hernandez's immediate supervision. Herrera points to no facts suggesting

Hernandez reviewed Herrera's CSR coaching log, or any individual CSR's coaching log for that matter. Nor does she offer circumstantial evidence – such as evidence of a regular process that required Center Sales Managers to review CSR coaching logs – suggesting Hernandez may have come across Herrera's coaching log and learned she was on FMLA leave. Rather, it appears the "coaching log," as the term and the undisputed facts of this case suggest, was used specifically to chronicle the progress, developmental endeavors, and training efforts between CSRs and their coaches. Therefore, the undisputed facts demonstrate Hernandez was unaware of Herrera's protected status at least until after she decided to place Herrera on suspension pending termination.

Furthermore, even if the Court were to find the timing of Hernandez's decision suspicious, "suspicious timing alone . . . does not support a reasonable inference of retaliation." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006); *see also Buie*, 366 F.3d at 506 (finding temporal proximity insufficient to overcome summary judgment where plaintiff was on the brink of discharge before anyone at the company knew of his disability); *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 643 (7th Cir. 2002) ("[W]e remind that mere temporal proximity between [a plaintiff's protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue."); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("[T]he mere fact that one event preceded another does nothing to prove that the first event caused the second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another."); *Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1034 (7th Cir. 1999) ("[T]he temporal sequence analysis is not a magical formula which results in a finding of a discriminatory cause.") *overruled on other grounds*, *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 963 (7th Cir. 2010). Spurious timing has been

recognized as evidence tending to give rise to the inference of unlawful motive where there are additional, often more compelling factors, weighing in favor of the plaintiff. *See, e.g., Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 201 (7th Cir. 2011) (ambiguity of the plaintiff's alleged threat in the workplace, the fact that another employee made more concrete threats at work and was not disciplined, the defendant's hostility toward plaintiff's request for an accommodation, *and* the timing of the defendant's adverse action provided sufficient evidence to permit a reasonable trier of fact to infer pretext and retaliatory intent).

Here, however, Herrera points to no additional factors supporting her theory that Hernandez's decision was motivated by her disability or use of FMLA leave. While Herrera claims that two of her coaches, Pacheco and Espinoza, made ambiguous statements regarding her condition, she has failed to present any evidence demonstrating that either individual drove the decision to terminate her employment based on her disability or use of FMLA leave. In order to prevail, Herrera must either "provide direct or circumstantial evidence that the *decisionmaker* has acted for a prohibited reason," *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378–379 (7th Cir. 2011); *Long*, 585 F.3d at 351, or show that her immediate supervisors "perform[ed] an act motivated by a [prohibited] animus that was *intended* by the supervisor[s] to cause an adverse employment action" and was in fact "a proximate case of the ultimate employment action." *Staub v. Proctor Hospital*, 131 S.Ct 1186, 1194 (2011) (emphasis in original). "A decisionmaker is the person 'responsible for the contested decision.'" *Long*, 585 F.3d at 351 (quoting *Rogers*, 320 F.3d at 754). Statements by subordinates and nondecisionmakers, without more, cannot provide the basis for a determination of discrimination. *See Schandelmeier-Bartels*, 634 F.3d at 379 (finding no pretext even where the evidence clearly supported the conclusion that the plaintiff's immediate supervisor harbored an

illegal racial animus because the supervisor was "not the person who pulled the trigger to end [the plaintiff's] employment"); *Long*, 585 F.3d at 351. This means that even if the evidence were to support Herrera's position that Pacheco and Espinoza harbored discriminatory bias toward her, Herrera could not prevail without also showing (1) that Pacheco or Espinoza acted upon discriminatory or retaliatory animus with the intention of causing Hernandez to terminate Herrera's employment, and (2) that those actions were "causal factors" underlying Hernandez's decision to terminate Herrera. *Staub*, 131 S.Ct. at 1195.

Herrera has failed to make either showing in this case. Herrera points to no communications between her immediate supervisors and Hernandez that could be construed as intentional attempts to terminate her employment based on her disability or use of FMLA leave. Nor has she argued that Pacheco or Espinoza manufactured or made improper adjustments to the PAR scores Hernandez relied upon in making her decision. *See Staub*, 131 S.Ct. at 1994 (finding that an employer may be liable for discrimination if it relies on facts provided by a biased supervisor when determining whether to terminate an employee). Pacheco and Espinoza's comments towards Herrera, while crass and insensitive, to say the least, do not establish that Hernandez, the decisionmaker in this case, acted with unlawful discriminatory or retaliatory animus toward Herrera. Nor can Herrera prevail on a "cat's paw" theory of liability by imputing Pacheco and Espinoza's alleged discriminatory animus to Hernandez. "In employment discrimination cases, the cat's paw is the unwitting manager or supervisor who is persuaded to act based on another's illegal bias." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011); *see also Hill v. Potter*, 625 F.3d 998, 1002 (7th Cir. 2010) ("In other cases where we have applied the cat's paw theory, there was evidence from which we could reasonably infer that the employer's ill motives likely had an influence on the

purportedly independent decisionmaker's thought process.").  To prevail under the cat's paw theory of liability, a plaintiff need not prove that the nondecisionmaker was the "singular influence" that caused the decisionmaker to terminate the plaintiff. *See Staub*, 131 S.Ct at 1190–93 (finding that an immediate supervisor's discriminatory animus may form the basis for a liability against an employer even where the decisionmaker exercises independent judgment in terminating the plaintiff).  Rather, Herrera must simply show that her supervisors acted upon a prohibited animus intending to cause, and proximately causing, an adverse employment action.  *Staub*, 131 S.Ct. at 1994 (emphasis in original).  To the extent that Herrera relies on such a theory in this case, this Court rejects it, as Herrera has put forth no evidence suggesting Pacheco or Espinoza tainted Hernandez's assessment of her conduct.

Because Herrera has failed to put forth either direct or circumstantial evidence of disability discrimination or unlawful retaliation, her ADA discrimination and FMLA retaliation claims fail under the direct method of proof.

## II.     Indirect Method of Proof

In the absence of direct evidence, courts apply the *McDonnell Douglass* burden-shifting framework to claims of disability discrimination under the ADA and retaliatory discharge under the FMLA. *Buie*, 366 F.3d at 503 (ADA discrimination); *King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999) (FMLA retaliation).  The elements of proving disability discrimination and FMLA retaliation under the indirect method essentially mirror one another.  To establish a *prima facie* case of disability discrimination under the indirect method of proof, Herrera must show: (1) she is disabled within the meaning of the ADA; (2) she was meeting Illinois Bell's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated

employees received more favorable treatment. *See Mobley*, 531 F.3d at 548 (quoting *Rooney v. Koch Air*, 410 F.3d 376, 380–81 (7th Cir. 2005)). Similarly, under the indirect method of proving retaliation, Herrera may establish a *prima facie* case by demonstrating she: (1) engaged in a statutorily protected activity (*i.e.*, that she took FMLA leave); (2) met Illinois Bell's legitimate employment expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Cracco*, 559 F.3d at 634–35. If Herrera makes her *prima facie* case, the burden shifts to Illinois Bell to articulate a legitimate, non-discriminatory reason for its actions. *See Buie*, 366 F.3d at 503 (citing *Dvorak*, 289 F.3d at 485). If Illinois Bell meets this burden, Herrera would have to prove, by a preponderance of the evidence, that Illinois Bell's proffered reasons were pretext for intentional discrimination or FMLA retaliation. *See id*; *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1128 (7th Cir. 2006) (ADA discrimination); *Cracco*, 559 F.3d at 634–35 (FMLA retaliation); *Buie*, 366 F.3d at 503 (FMLA retaliation).

Again, with respect to the first element, Illinois Bell does not dispute for the purposes of its Summary Judgment Motion that Herrera was disabled within the meaning of the ADA and that she engaged in statutorily protected activity by taking FMLA leave. Nor does Illinois Bell dispute the second element – that its termination of Herrera constituted an adverse employment action. Therefore, only the second and fourth elements are in dispute. Specifically, Illinois Bell argues that Herrera cannot show she was meeting Illinois Bell's legitimate employment expectations or that Illinois Bell treated similarly situated non-disabled employees and employees who did not take FMLA leave more favorably than they treated her.

### A.    Legitimate Employment Expectations

In order to establish a *prima facie* case for disability discrimination or unlawful FMLA retaliation under the indirect method of proof, Herrera must demonstrate that she met Illinois Bell's legitimate employment expectations. *See Cracco*, 559 F.3d at 634–35 (FMLA retaliation); *Mobley*, 531 F.3d at 548 (disability discrimination). The undisputed facts reveal she did not. Illinois Bell expects its CSRs to maintain a monthly minimum PAR score of 85, which Illinois Bell considers "meeting some expectations." While Herrera offers explanations for why it was difficult for her to meet this requirement, she does not dispute the reasonableness of the expectation itself or the fact that she understood it. Despite Illinois Bell's efforts to provide Herrera with coaching opportunities to help improve her performance, and its leniency in applying its progressive discipline policy, Herrera failed to achieve satisfactory PAR scores on a consistent basis. In the twelve months leading up to Hernandez's decision to place Herrera on suspension pending termination, Herrera achieved a PAR score above 85 only three times. Herrera's first month of unsatisfactory performance during this time period was November of 2008, when she earned a PAR Score of 73.35. In the four months that followed, Herrera failed to achieve a PAR Score greater than 74. Had Hernandez strictly adhered to the CCC's three-step disciplinary process, Herrera would have been issued a written warning in November 2008, given a final written warning with a one-day unpaid suspension in December 2008, and suspended pending termination in January 2009. It was because of Hernandez's repeated exercise of leniency that Herrera was able to prolong her employment through 2009 and into 2010. After receiving Herrera's November 2008 PAR score, Hernandez granted Herrera an SR-30, which excused her unsatisfactory PAR score for that month. Although Herrera received her first written warning and was placed on a PIP for another poor score the following month, she was not disciplined in January 2009 and was granted a second SR-30 in February 2009.

It was not until March of 2009, after five straight months of poor performance, that Hernandez progressed Herrera to the second step of the disciplinary process by issuing a final written warning and one-day suspension. When Herrera's PAR scores came in below 85 in the months that followed, Illinois Bell repeated the final warning step of its disciplinary process three times before placing Herrera on suspension pending termination. Finally, in October of 2009, Hernandez decided to move Herrera up to the third and final step of the CCC's progressive disciplinary process – suspension pending termination. Based on this performance history, Herrera cannot convincingly maintain that she met Illinois Bell's legitimate employment expectations.

The fact that Herrera's November 2009, December 2009, and January 2010 PAR scores met the minimum requirements does not change the outcome of the analysis. By the time the November score was released in January of 2010, the decision to place Herrera on suspension pending termination had already been made. Herrera's November 2009 PAR Score of 85.81—barely above the CCC's minimum requirement—does not compel this Court to change its finding that Herrera failed to meet Illinois Bell's expectations. Herrera's December 2009 and January 2010 PAR scores are even more easily discountable. Because Herrera began her disability leave on December 3, her December 2009 PAR score of 99.19 is based on only one-and-a-half days worth of calls. In January 2010, Herrera was still on disability leave and did not come into work. Therefore, her PAR score of 92.5 for that month is based not on her performance but on a rolling average of the previous three months, including the month of December. For these reasons, Herrera's PAR scores for November 2009 through January 2010 do not change the Court's conclusion that Herrera failed to meet Illinois Bell's legitimate employment expectations.

Herrera also argues that she was "held to the same performance standards even though she

26

had significantly less opportunities to sell because of her FMLA use." (Pl. Resp., p. 6.) According to Herrera, Illinois Bell should have "adjust[ed] her sales quotas and performance scores to account for her protected leave." (*Id.*) The undisputed facts prove otherwise. Herrera points to no evidence suggesting any of the PAR scores leading up to her discharge were affected by her use of FMLA leave, nor does she put forth evidence showing that an adjustment would have raised her scores to an acceptable level. Furthermore, Illinois Bell's method for calculating PAR scores invalidates any contention by Herrera that her scores were deflated due her use of disability leave. Herrera explained at her deposition that CSRs' sales results are based on a metric of "per 100 calls." (Herrera Dep., p. 171.) This meant that the sales performance component of Herrera's PAR score was not based on the raw number of sales, but rather on the number of sales she made for each 100 calls. Herrera admits that the number of calls she took did not determine her results; rather, it was her efforts to make sales on the calls she handled – regardless of the number – that determined her results. (*Id.*, p. 174.) Herrera's own PAR scores are illustrative. For example, Herrera handled 2,361 calls in November 2008, and achieved an unsatisfactory PAR score of 73.35. (*Id.*, Ex. 4.) Similarly, in the following month, Herrera handled 2,165 calls and achieved a PAR score of 69.43. (*Id.*, Ex. 8.) To contrast, Herrera earned a satisfactory PAR score of 85.91 in April of 2009, even though she handled only 1,503 calls. (*Id.*, Ex. 16.) Herrera earned her best PAR score in August of 2009, when she handled only 366 calls. (*Id.*, Ex. 22.) Finally, although Herrera, having taken FMLA leave beginning December 3, 2009, took only 52 calls during the month of December, she was able to obtain a PAR score of 99.19 for the month. Based on this data, it is clear that Illinois Bell's PAR system did not penalize Herrera for using FMLA leave.

### B.    Similarly-Situated Employees

Herrera also has not met her burden of identifying a similarly situated employee outside of her protected class who was treated better than her. In order to satisfy this element of her *prima facie* case, Herrera must point to an individual or individuals that are "directly comparable to her in all material respects." *Burks*, 464 F.3d at 751 (quoting *Patterson v. Avery Dennison Corp.*, 281 F3d 676, 680 (7th Cir. 2002)); *see also Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846–47 (7th Cir. 2006). Factors relevant to this inquiry include: (1) whether the employees reported to the same supervisor; (2) whether they were subject to the same standards; and (3) whether they had comparable education, experience, and qualifications. *Burks*, 464 F.3d at 751. In addition, the similarly situated employee must display a "comparable set of failings" or have engaged in similar conduct without being subjected to the same disciplinary measures. *Id.* (finding that *prima facie* case was not met where plaintiff could not point to a coworker with a comparable set of failings); *see also Harris v. Warrick County Sheriff's Dept.*, 666 F.3d 444, 449 (7th Cir. 2012) ("To establish that employees not in the protected class were treated more favorably, the plaintiff must show that those employees were similarly situated with respect to performance, qualifications, and conduct."); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000) (explaining that the similarly situated employee must have "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them").

In this case, Herrera would need to identify an employee who was not disabled or did not take FMLA leave who consistently earned PAR scores below 85 without being discharged. She has not done so. Herrera does not identify a single non-disabled Illinois Bell employee who had a performance record similar to hers that was not discharged; nor has she identified an employee who did not use FMLA leave and retained their employment despite consistently unsatisfactory PAR

28

Scores. Herrera's claim that she saw scorecards of five other CSRs who were granted SR-30s after achieving similarly low PAR scores does not save her position. First, the contents of these scorecards are hearsay to the extent they are being offered to prove the PAR scores of these five employees, and are therefore not properly before the Court on summary judgment. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). *See also Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) (inadmissible hearsay not enough to preclude summary judgment); *Esenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (hearsay is inadmissible in summary judgment proceedings to the same extent it is inadmissible at trial). Herrera has not offered these employees' scorecards as exhibits for the Court to consider, nor has she presented testimony from the five individuals who supposedly received disparate treatment. With the proper foundation, the PAR scorecards may conceivably be admissible as records of regularly conducted business activity under Federal Rule of Evidence 803(6). Here, however, Herrera has not attempted to offer the scorecards as business records through the testimony of a custodian or other qualified witness. *See* Fed.R.Evid. 803(6)(D).

More substantively, even if the scorecards were properly before the Court, they would do little to prove that similarly situated employees outside of Herrera's protected class were treated more favorably. This is because Herrera has failed to identify enough common features between herself and the other CSRs to allow for a meaningful comparison that would lead a jury to infer discrimination. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd* 128 S.Ct. 1951 (2008). Herrera presents no evidence of the other CSRs' PAR scores, performance histories, whether they were granted SR-30s for months other than the ones reflected on the

scorecards Herrera claims to have seen, or whether they were also allowed to repeat steps of the CCC's progressive disciplinary process. Without such a showing, Herrera cannot show that her comparators exhibited a "comparable set of failings," nor can she convincingly maintain that other CSRs received more lenient treatment.

Additionally, Herrera has failed to demonstrate that any of the five CSRs she points to as comparators were outside of her protected class; that is, she has not established that they were not disabled or did not utilize FMLA leave. Without a showing that the alleged comparators are outside of Herrera's protected class – or, with respect to Herrera's FMLA retaliation claim, did not engage in protected activity – any further comparison would be meaningless. For example, even if Herrera were to prove Maria Galvez (one of her alleged comparators) was a similarly situated employee who was not terminated despite a history poor performance, the disparate treatment would be useless (even harmful) to Herrera's claim if Galvez was also disabled or took FMLA leave. As Herrera has failed to identify CSRs outside of her protected class that avoided termination despite similar performance and disciplinary histories, the Court finds she has not made requisite showings necessary to establish that similarly situated employees were treated more favorably than her.

Herrera's reliance on *Leffel v. Valley Fin. Servs.*, 113 F.3d 787 (7th Cir. 1997) for the proposition that she need not identify a similarly situated employee is misplaced. In *Leffel*, the plaintiff, a former branch manager at a bank, filed suit against the bank alleging she was discharged based on her multiple sclerosis in violation of the ADA. *Id.* at 789, 791. In analyzing the fourth element of the plaintiff's *prima facie* case, the Court recognized that, as a branch manager, the plaintiff "occupie[d] a position of significantly greater responsibility and discretion than that of most other bank employees," and therefore "may find it difficult to find evidence of disparate treatment

in criticisms that are intertwined with unique aspects of her position." *Id.* at 794. The Court determined that given the situation, it would be unfair to rigidly adhere to the *McDonnell Douglass* framework by requiring the identification of similarly situated employees. *Id.* at 793–94 ("[T]he nature of the proof giving rise to the requisite inference of discrimination cannot be reduced to a formula that will serve any and all discrimination cases."). Instead, the Court articulated a more flexible variant of the *McDonnell Douglass* framework. Under this modified approach, a plaintiff may satisfy the fourth requirement of establishing a *prima facie* case by showing "that the circumstances surrounding [the adverse actions] indicate that it is more likely than not that [the plaintiff's] disability was the reason for [the] adverse actions." *Id.* at 794.

However, the overwhelming majority of cases decided after *Leffel* demonstrate that *Leffel* did not dispose of the requirement that a plaintiff identify similarly situated employees outside of her protected class that were treated more favorably. *See, e.g., Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010) ("[The Plaintiff] has not established his prima facie case under the indirect method because he cannot show either that he was performing his job satisfactorily or that there is any similarly situated employee who was treated differently."); *Winsley*, 563 F.3d at 605 ("[The Plaintiff's] claim fails under the indirect method because she is unable to identify a similarly situated employee outside the protected class who was treated more favorably than she was."); *Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007); *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007) ("[A] plaintiff must show that after filing the complaint of discrimination only she, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though she was performing her job in a satisfactory manner.") (quoting *Stone*, 281 F.3d at 644); *Burnett v. LFW Inc.*, 472 F.3d 471, 481–82 (7th Cir. 2006) ("To proceed

31

under the indirect method, [the Plaintiff] must show that after taking FMLA leave (the protected activity) he was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a satisfactory manner.") (quoting *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 951 (7th Cir. 2006). In *Timmons v. General Motors Corp*, the Seventh Circuit revisited its decision in *Leffel* and confirmed the notion that the modified framework used in *Leffel* was designed to address special circumstances. 469 F.3d at 1126. (explaining that "[s]ometimes a plaintiff cannot identify similarly situated employees" and the reason courts have not strictly adhered to the fourth prong of the *McDonnell Douglas* framework is to "allow for such circumstances").

Such unique circumstances do not exist in this case, as there was an abundance of potentially comparable employees working in the CCC. Approximately 150 to 225 CSRs worked at the CCC during the time period at issue. These CSRs performed the same tasks as Herrera, in the same location, under the supervision of the same team of coaches, had their performance reviewed in accordance with the same PAR system, and were all under the authority of the same Center Sales Manager. Unlike the plaintiff's claim in *Leffel*, the problem with Herrera's claim is not a lack of comparable employees, but a failure to mine a seemingly abundant pool of potentially suitable comparators and present sufficient details demonstrating the individuals in that pool are similarly situated.

Furthermore, even the limited number of cases proceeding on *Leffel*'s more liberal formulation of the *McDonnell Douglass* framework have nevertheless found themselves relying heavily, or almost entirely, on the identification of similarly situated employees when applying the fourth prong of the test. *See, e.g., Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 931 (7th Cir. 2001)

(reversing summary judgment on diabetic plaintiff's ADA claim where the plaintiff completed training with a "high quiz average" and defendant hired every other member of plaintiff's program class); *Spath v. Hayes Wheels Intern.-Indiana, Inc.*, 211 F.3d 392, 396–97 (7th Cir. 2000) (using test articulated in *Leffel* but ultimately analyzing the fourth prong under the similarly-situated employee analysis); *Murawski v. Tri Service, Inc.*, 36 F.Supp.2d 1041, 1044 (N.D. Ill. 1999) (plaintiff satisfied final element of *prima facie* case by demonstrating suspicious timing and by showing that defendant hired a non-disabled employee to the same position after terminating the plaintiff).

Lastly, in *Leffel* and *Timmons*, as well as *Lawson* and *Spath*, the court used the alternative approach in analyzing claims brought under the ADA. Herrera points to no authority, and this Court finds none, supporting her position that she may establish a *prima facie* case of FMLA retaliation without demonstrating that similarly situated employees who did not take FMLA leave were treated disparately. Because the Court has determined *Leffel* does not apply to the circumstances presented here, and further concluded that Herrera's claim would fail even if it did, the Court need not decide whether *Leffel*'s reasoning ought to be extended to FMLA retaliation claims. However, the Court notes that at least one court in this District has explicitly rejected such an extension. *See James v. Hyatt Regency Chicago*, No. 09 C 7873, 2011 WL 6156825, at *6 (N.D. Ill. Dec. 12, 2011) ("[*Leffel*] is inapposite because it dealt not with FMLA retaliation but with an ADA discrimination claim by an employee whose position had "unique aspects," so that she could not point to any similarly situated employee.").

Therefore, because Herrera has not demonstrated that she was meeting her employer's legitimate employment expectations or shown that similarly situated employees outside of her protected class were treated more favorably, Herrera cannot make out a *prima facie* case for

disability discrimination or FMLA retaliation.

### C.   Pretext

Even if Herrera was able to satisfy the elements of her *prima facie* case, she is unable to demonstrate that Illinois Bell's reason for terminating her—consistently low PAR scores—was a pretext for discrimination.  To show pretext, Herrera must prove that Illinois Bell's proffered reason for taking the adverse action was dishonest and that the true reason was based on discriminatory or retaliatory intent. *See Senske v. Sybase, Inc.* 588 F.3d 501, 507 (7th Cir. 2009).  If Herrera cannot offer this evidence directly, she must present indirect evidence challenging the credibility of the employer's reasoning. *Id.*  This can be accomplished by demonstrating "either that a discriminatory reason more than likely motivated [Illinois Bell] or that [its] explanation is unworthy of credence." *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998); *see also Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000) ("In order to show pretext, [the Plaintiff] must demonstrate that [the Defendant's] proffered reason is a lie or completely lacks a factual basis.")

Herrera cannot show that Illinois Bell's grounds for terminating her were factually baseless. Herrera points to no evidence suggesting Pacheco or any other coaches or supervisors fabricated Herrera's monthly PAR scores.  Nor has Herrera shown that Hernandez, the decisionmaker, manufactured those scores to cover up unlawful discriminatory or retaliatory animus toward her. Herrera maintains that Hernandez should have considered her November and December 2009 PAR scores when deciding whether to terminate her employment, but Illinois Bell is entitled to think otherwise. *See Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002).  The analysis of whether an employer's decision was pretextual does not delve into the "the correctness or desirability of the reasons offered for employment decisions, but rather the issue of whether the employer honestly

believes the reasons it offers." *Id.* Ultimately, Herrera argues about "the merits, rather than the honesty of [Illinois Bell's] explanation, and thereby misses the point of the pretext inquiry." *Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008); *see, e.g., Olsen v. Marshall & Illsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001) ("[The Plaintiff] may be correct in suggesting that one month of exceptional performance would allay the average employer's performance concerns, but we are not concerned with the average employer. Our only concern at the pretext stage is whether this defendant honestly remained dissatisfied with its employee's performance."). It is not the place of this Court to decide whether Illinois Bell reached the *right* decision, so long as it was an *honest* one. *See Grayson*, 308 F.3d at 820 ("[T]he federal anti-discrimination laws do not authorize judges to sit as a kind of 'super-personnel department' weight the prudence of employment decisions.") (quoting *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997)); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.") (citations omitted). At the end of the day, the pretextual inquiry boils down to whether "the same events would have transpired if [Herrera] had [not been disabled or not taken FMLA leave] and everything else had been the same. *Senske*, 588 F.3d at 507 (citing *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994)). Given Herrera's consistently low PAR scores, demonstrated inability to improve over a twelve month period, and the lack of evidence suggesting there was some other motivation behind the decision to terminate Herrera's employment, Herrera cannot maintain that Illinois Bell's stated reasons for terminating her were pretext for disability discrimination or unlawful retaliation.

**CONCLUSION AND ORDER**

For the foregoing reasons, Illinois Bell's motion for summary judgment is granted.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: February 21, 2013